**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:20-CV-00483-FDW-DCK**

| | |
|---|---|
| **VERONICA POLK,** | |
| Plaintiff, | |
| **v.** | **FIRST AMENDED COMPLAINT** |
| | **(Jury Trial Demanded)** |
| **MECKLENBURG COUNTY,** | |
| Defendant. | |

COMES NOW Plaintiff Veronica Polk, complaining of Defendant Mecklenburg County, and alleges as follows:

<u>**INTRODUCTION AND NATURE OF ACTION**</u>

1.      Plaintiff Veronica Polk (hereinafter "Ms. Polk" or "Plaintiff") worked as a Nurse for the Mecklenburg County Health Department (hereinafter "Health Department") for two years, helping low income patients.  Over the last several years it has been well-known that the Health Department's standard of patient care and oversight severely deteriorated, resulting in an ongoing public health and safety crisis.  The Health Department failed to inform scores of patients about their abnormal test results for Pap smears, which test for cervical cancer, and sexually transmitted diseases.  When Ms. Polk's attempts to address the issues internally within the Health Department were dismissed and ignored, she spoke out to County officials.  The County terminated Plaintiff shortly after she reported these issues to County Commissioners.

2.     Plaintiff is a person with a disability within the meaning of the Federal Americans with Disabilities Act, and North Carolina's Equal Employment Practices Act. As such, Plaintiff required time off from work for medical appointments, treatment, and to recover from illness, and received protected Family Medical Leave Act leave for treatment for her medical conditions. Plaintiff was treated with disdain, harassed, suspended from employment and terminated, in whole or in part due to her disability, treatment for her medical conditions, and FMLA leave.

3.     Plaintiff's claims arise under the Family Medical Leave Act, the Americans with Disabilities Act, as amended, the First Amendment to the U.S. Constitution, Article I, §§ 1 and 14 of the North Carolina Constitution, and North Carolina's common law protection against wrongful discharge in violation of North Carolina public policy.

## PARTIES

4.     Plaintiff Veronica Polk (hereinafter "Plaintiff" or "Ms. Polk") is an adult citizen and resident of Charlotte, Mecklenburg County, North Carolina.

5.     Upon information and belief, Defendant Mecklenburg County (the "County" or "Defendant") is organized under §153A of the North Carolina General Statutes, and has its principal office and place of business in Charlotte, Mecklenburg County, North Carolina, where it maintains and administers a health department known as the Mecklenburg County Health Department (the "MCHD" or "Health Department") which employed Plaintiff until April 29th, 2019.

6.     To the extent it is applicable, the County has adopted a plan of insurance pursuant to N.C. Gen. Stat. § 153A-435 and has waived its immunity from civil liability.

## JURISDICTION AND VENUE

7.     The unlawful practices alleged in this Complaint were committed in Mecklenburg County, North Carolina.

8.     Jurisdiction and venue are proper in this Court pursuant to N.C. Gen. Stat. §§ 1-75.4 and 1-79.

## ADMINISTRATIVE PROCEDURES

9.     Plaintiff timely filed a complaint of discrimination and retaliation against the County with the Equal Employment Opportunity Commission ("EEOC") on or about April 22nd, 2019.

10.    On or about March 9, 2020, Plaintiff received a Notice of Right to Sue from the EEOC entitling her to commence an action within 90 days of receipt of that notice.

11.    Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

## BACKGROUND

12.    Mecklenburg County is the largest county in North Carolina, with over one million in population.

13.    The Health Department provides medical services to Mecklenburg County, which includes Charlotte and the surrounding area.  The Health department has over 800 employees.

14.    The Health Department's role is to protect the public, including controlling public health threats such as sexually transmitted diseases, highly contagious diseases, and food-borne illnesses.

15.    The Health Department provides health screenings, immunizations, HIV/STD testing, and family planning services.  Its women's health clinic provides breast screenings, colorectal screenings, and pap smears.

16.     The Health Department serves low income residents without health insurance.  Its patients are mostly minorities, including refugees who require medical screenings.

17.     In 2010, Plaintiff earned her Associates degree in nursing ("ADN") from MDT College of Health and Science.

18.     Plaintiff is an African American female.

19.     Plaintiff was hired by the County on or about January 9, 2017 and was employed as a pediatric Nurse Case Manager for one year, and then an nurse with the Women's Health work unit, primarily working with adult Sexually Transmitted Diseases  (hereafter "Adult Health STD") Nurse from January 2018 until the termination of her employment.

20.     Plaintiff was one of approximately 65 employees in her department.

21.     As an Adult Health STD Nurse Plaintiff was responsible for informing patients and their partners of the results of sexually transmitted disease testing and referring patients out to appropriate agencies if necessary.  Plaintiff worked with refugees and patients at risk for STD's.

22.     Plaintiff always provided a high level of professional care for her patients.

23.     Plaintiff is known for being an excellent Adult Health STD Nurse, who was able to handle the most difficult cases and to put patients at ease.

24.     Health Department employees regarded Plaintiff as a team player who was dedicated, effective, efficient, and knowledgeable.

25.     Plaintiff was well-versed in the Health Department's policies and procedures for general operation and health and safety.

26.     The Health Department's patient care was so poor that public health and safety crises were imminent.

27.     Plaintiff reported Health Department's health and safety crises up through the County's chain-of-command, which included County Management and Human Resources. Plaintiff also eventually complained to County Commissioners.

28.     The County retaliated against and terminated Plaintiff, in whole or in part, for reporting public health and safety crises to the County and County Commissioners.

29.     Plaintiff's education, training and experience enabled her to spot health and safety issues affecting patients in areas beyond her responsibility. Plaintiff cares deeply about the communities the Health Department serves.

30.     Unfortunately, County Management and Human Resources were dismissive of or non-responsive to Plaintiff's complaints about patients' health and safety.

31.     Plaintiff reported serious concerns including but not limited to: inaccurate and untimely STD test results provided to patients; failure to provide language translation for Non-English Speaking patients; lack of patient care; and lack of oversight (hereinafter "Health and Safety Complaints").

32.     In March 2018, Plaintiff initiated her first internal complaint. Plaintiff emailed Human Resources and her supervisor Linda Kinney, Health Manager (hereinafter "Ms. Kinney"), requesting that some corrective action be taken regarding the inaccuracies of sexually transmitted disease testing. The County had failed to inform patients of positive test results often providing an inaccurate negative result. This misinformation provided to patients, affected patients care and health creating a large public health risk leading to patients' potential spreading of sexually transmitted diseases.

33. Upon information and belief, there had been a flaw in the STD testing process, resulting in testing inaccuracies. Despite management's knowledge of the testing inaccuracies, management pressured Plaintiff and others to report potentially false information to patients.

34. As a default management advised employees to inform patients that they tested negative for sexually transmitted diseases.

35. In March 2018, Plaintiff also raised concerns of improper training (i.e. instructing nurses to provide negative results to patients). Plaintiff offered to meet with Ms. Kinney to discuss these concerns.

36. The failure to report accurate test results often led to misinformation being provided to patients, potentially resulting in patients' spreading of sexually transmitted diseases.

37. However, Ms. Polk's complaint went unaddressed. No corrective action was taken.

38. In March 2018, Plaintiff also raised concerns to Ms. Kinney, regarding the Health Department's issuance of letters, written in English only to non-English speaking patients, which contained important test result information.

39. Plaintiff was aware that many of her patients were unable to comprehend the letters, because they were not fluent in English, and requested that the letters be translated.

40. Ms. Polk contacted Kirk Dodson, Administrative Support Coordinator (hereinafter Mr. Dodson) to retrieve a quote to translate a document.

41. Upon information and belief, on April 2, 2018, Ms. Kinney received an email from Mr. Dodson providing a quote to translate.

42. Ms. Kinney denied this request.

43.     Ms. Kinney told Plaintiff that translation of letters would be financially burdensome to the Health Department.

44.     Although Ms. Kinney spoke with Plaintiff about her complaints, nothing was done to address any of her concerns.

45.     Plaintiffs concerns escalated as she noticed the lack of action in response to her complaints.

46.     In April 2018, Ms.. Polk sought and received approval for FMLA leave due to her medical conditions. Ms. Polk is and was at all relevant times a person with a disability within the meaning of the ADAAA. Her medical conditions during her last year of County employment including severe migraines, PTSD and other serious health conditions.   These medical conditions substantially limited her in one or more major life activities.   The major life activities substantially limited included concentration, memory, sleeping and performance of manual tasks. During the last year of her County employment Ms. Polk's migraines occurred approximately three times per month, and affected her between 2 to 3 days each time.  When she was affected by her migraines, she suffered severe pain, which was not adequately controlled by medications. She had so much pain that she could not concentrate and her memory was affected.  Due to both the migraines and PTSD her sleep was frequently very disrupted so that she could not get to sleep, had interrupted sleep and did not receive adequate rest.  In addition, during the last year of her County employment she suffered from hand tremors which occurred sporadically; when those occurred she could not perform fine motor tasks.  Ms. Polk has had to undergo surgery because of the medical conditions for which she was suffering at the time of her last year of employment with the Defendant County.

47.     Plaintiff received approval from her doctors to return to work on April 20, 2018. Due to the Health Department's unnecessary delays, Plaintiff was not permitted to return to work until April 26, 2018.

48.     On April 26, 2018, upon return from her medical leave, Plaintiff noticed that she was locked out of her work computer.  That same day, Human Resources contacted Plaintiff informing her that they would like to conduct a meeting regarding Plaintiff's concerns.

49.      Human Resources conducted a meeting with Ms. Polk, and told Plaintiff that Ms. Kinney was placing Plaintiff on suspension and that an internal investigation regarding Ms. Polk's health and safety concerns would be opened.

50.     Upon information and belief, Human Resources took no further action to address Ms. Polk's health and safety concerns.

51.     In the April meeting, Ms. Kinney criticized Ms. Polk, repeating a rumor that she had heard that Ms. Polk was seeking counseling due to her disability.

52.     During this time period, upon information and belief, Ms. Kinney also accused Ms. Polk of dishonesty, telling her co-workers that Ms. Polk just wanted time off from work to spend time with her family.

53.     The stated reason for Plaintiff's suspension was due to policy violations.  Plaintiff was accused of non-compliance with Mecklenburg County Human Resources Policy & Procedures.  Plaintiff denies non-compliance, denies that she had poor performance, and alleges that prior to her taking leave and complaining of safety concerns she was recognized by Ms. Kinney as an exemplary employee.

54.     Before Plaintiff's complaints and medical leave, Ms. Kinney would often praise Plaintiff for her performance acknowledging that "the team was lucky to have her."

55.     On March 22, 2018, Ms. Kinney acknowledged Plaintiff in an email expressing the importance of Plaintiff's value to the team and stating, "We are a dream team!"

56.     Ms. Kinney's compliments about Plaintiff's work performance came to an abrupt halt when Plaintiff began making formal complaints of health and safety violation.  Those complaints and Plaintiff's disability and need for FMLA leave triggered Ms. Kinney's hostile and retaliatory behavior.

57.     Plaintiff returned from her 30-day suspension on June 4, 2018.

58.     On June 4, 2018, a meeting was held with Ms. Kinney, Ms. Polk, and Natasha Jeffries, Employee Relations Specialist (hereinafter "Ms. Jeffries").

59.     During the meeting Ms. Kinney stated that Ms. Polk was lucky to have her job, and tried to make it appear that she had gone to bat for Ms. Polk.

60.     Ms. Kinney presented Plaintiff with a list of new expectations that were required of Plaintiff prior to returning to the clinic for work.

61.     Plaintiff expressed concerns about Ms. Kinney's lack of integrity in the workplace. No further action had been taken on Ms. Kinney's dishonesty, targeting, and retaliation towards Plaintiff.  Ms. Kinney's targeting and retaliation towards Plaintiff continued.

62.     Ms. Polk's father became gravely ill in late June 2018, and she went on medical leave to attend to him from July 3rd to August 22nd.  Prior to her leaving, Ms. Kinney challenged Ms. Polk, questioning how much leave she really needed to care for her father.

63.      Upon return to work in August 2018, the locks in Ms. Polk's office had been changed.  Plaintiff contacted Ms.  Kinney requesting assistance.  Ms. Polk was told by Ms. Kinney to meet her at another clinic.  On arrival Ms. Kinney denied that the office locks had been changed and provided Ms. Polk with a set of new keys.

64.     Other employees told Ms. Polk that Ms. Kinney had changed the locks while Plaintiff was out on medical leave.

65.     Ms. Kinney told Plaintiff that she hoped no one else in her family got sick because she would not allow Plaintiff another leave if needed.

66.     Ms. Kinney continued to harass Ms. Polk over her use of approved FMLA leave.

67.     Ms. Kinney consistently directed hostile comments towards Ms. Polk referring to Plaintiff's approved leave as "summer absence", "summer vacation", "summer getaway", and "summer leave."

68.     Ms. Kinney falsely accused Ms. Polk of not being in the workplace as scheduled.

69.     The leave policy had been changed at the direction of Ms. Kinney who placed new guidelines for complying with leave approval.

70.     Plaintiff was now required to confirm through email that Ms. Polk worked until the end of shift.  Moreover, Ms. Kinney began to closely monitor Plaintiff's activity.

71.     Ms. Kinney continued to castigate Ms. Polk, threatening her with unwarranted write-ups for her performance in previous months.

72.     On August 24, 2018, Ms. Polk asked to meet with Ms. Kinney's supervisor to discuss Ms. Kinney's false allegations against her.  A meeting was held, and immediately thereafter Ms. Kinney issued a written warning to Ms. Polk, backdated to June 27, 2018.

73.     Based on the Health Department's past actions and failure to act, Plaintiff reasonably felt as if she had no one else to turn to internally to report problems that affected the health and safety of patients.

74.     In or around September 2018, Plaintiff emailed County Manager Diorio and County Commissioner Scarborough expressing concerns that Clinical Services Manager

Kinney's suspension of Plaintiff in or around April 2018 was retaliation for her "speaking out" about the poor judgment of the Health Department—again, relating to her complaints that patient safety and health were being compromised. Based on the Health Department's past actions, and failure to respond to her complaints, Plaintiff reasonably felt she had no one to turn to internally.

75.     In September 2018, Plaintiff received a call from Human Resources informing Plaintiff that she was to report to Human Resources immediately.

76.     In or around September 2018, Plaintiff again met with Human Resources, and discussed Plaintiff's health and safety concerns. No action was taken.

77.     In fact, no one with the County responded or took action regarding Plaintiff's Health and Safety Complaints even though Plaintiff was trying to help the County address and correct the problems, to improve the quality of care it provided to patients, and to promote health and safety for patients.

78.      On September 12, 2018, Ms. Kinney ordered Plaintiff to work at a shelter to assist during the anticipated hurricane disaster and told Ms. Polk that noncompliance would place Plaintiff's job in jeopardy.

79.     Upon information and belief, other similarly situated Health Department employees had been provided the option to sign up on a list to work at the shelter. However, Plaintiff was the only employee ordered to work at the shelter.

80.     In September 2018, Ms. Kinney falsely accused Plaintiff of having a drug or alcohol habit, due to her hand tremors, and offered to help her overcome it. Ms. Kinney said that if Ms. Polk just told her the truth about her addiction, she, as a Greek., could help Ms. Polk.

81.     On or about September 20, 2018, Ms. Kinney and Tesha Boyd, Assistant Health Director Clinical Services (hereinafter "Manager Boyd") presented Ms. Polk with an annual

review. This annual review's ratings were low, and the low ratings were retaliation for Ms. Polk's health and safety complaints and her disability, treatment for her medical conditions, and FMLA leave.

82. During the annual review, although Ms. Kinney depicted Plaintiff as an employee who lacked the ability to interact professionally, Ms. Kinney acknowledged that she had intentionally provoked negative interactions with Plaintiff and other employees.

83. Ms. Kinney criticized Plaintiff's absences., ignoring the fact that she had been out on FMLA leave, and tried to hold Plaintiff accountable for staffing and work assignments she could not have performed because she was out on leave.

84. Upon information and belief, similarly, situated employees were all presented with an annual raise, and Plaintiff was the only employee who was denied an annual raise.

85. Ms. Polk immediately filed a grievance about her annual review of September 20, 2018, and against Manager Boyd for failing to address the retaliation against Polk from Ms. Kinney.

86. On or about November 5, 2018, Ms. Polk was notified that her grievance allegations were unsubstantiated.

87. On November 13, 2018, Ms. Polk appealed the grievance findings.

88. Immediately following her performance review Plaintiff had been tasked with additional duties (those of a Triage Nurse) making it impractical to complete her tasks in a timely manner. Ms. Polk was essentially assigned two roles and provided no training for the new duties delegated to her. Furthermore, Ms. Kinney assigned new duties and schedules which made it impossible for Ms. Polk to complete daily tasks. Ms. Kinney informed Plaintiff that she would

be switched to the evening shift. Ms. Polk's work was monitored more regularly than similarly situated employees.

89. Moreover, when Ms. Polk sought to work overtime in order to finish her work, she was told that she was no longer allowed to stay late to complete daily tasks, yet Ms. Kinney continued to allow employees similarly situated to Ms. Polk to stay late and complete daily tasks.

90. In or around October 28, 2018, Plaintiff submitted two requests for medical leave. Plaintiff's first request pertained to her personal medical conditions, while the second request pertained to her son's medical conditions.

91. Plaintiff's leave request was approved for her personal conditions but the Human Resources Representative Tameka Small (hereinafter "Ms. Smalls") informed Plaintiff that they could not approve two requests for leave and denied Ms. Polk's request for FMLA leave for her son's medical conditions.

92. Ms. Polk's October 28, 2018, request for medical leave was repeatedly denied. Moreover, she was required to complete an email questionnaire prior to receiving a decision for leave and received work reviews prior to receiving approval or denial of leave request. Similarly situated employees were not required to do the same prior to leave approval.

93. Ms. Polk was repeatedly denied leave based on her supervisor's contention that her work was not completed, yet the work was not yet even due.

94. Upon information and belief, no other similarly situated employee had been treated as poorly as Ms. Polk with respect to leave denial and discipline.

95. On or about October 30, 2018, a meeting was held with Manager Boyd, Ms. Kinney, and Ms. Jenkins. Ms. Polk expressed her concerns regarding Ms. Kinney's creation of an excessively heavy workload and intense micromanaging of Ms. Polk. After Ms. Polk was

verbally attacked by all parties, she asked to leave the meeting. Manager Boyd responded "No you can't leave! Where they do that at?"

96.    After the meeting Manager Boyd told Plaintiff that she was going to teach her how to be tough and work through "whatever it is you got going on in your head."

97.    In or around November 2018, Plaintiff was forced to forfeit a pre-approved vacation due to clinic errors that caused an increase in Plaintiff's work. Meanwhile, Ms. Jenkins, Ms. Kinney, and Manager Boyd all went out on vacation.

98.    Ms. Kinney threatened Plaintiff's job, saying "you better be glad you canceled your vacation."

99.    Ms. Polk was out of work on medical leave from December 13, 2018, through January 2, 2019.   Although Ms. Polk was under doctor's care and medical leave had been previously approved, soon after her return, on January 8, 2019, she was issued a disciplinary writeup for this and other absences, and Manager Boyd encouraged her to resign.

100.    Plaintiff continued to do her job because she believed that all people should have access to quality healthcare.  Her work was important to the community she served.

101.    On January 23, 2019, Ms. Polk received notice that her FMLA request for intermittent leave had been approved for January 18, 2019 through July 17, 2019.

102.    On February 1, 2019, upon return from her break, Ms. Polk returned to her office and was presented with an embarrassing note marked on her white board by Manager Boyd.  Ms. Boyd did not engage in such hostile behavior with similarly situated employees.

103.    On February 11, 2019, Ms. Polk became very ill while at work.  Plaintiff immediately notified Manager Boyd and Ms. Jenkins, yet neither responded and Ms. Polk continued to work for an additional two hours until her pain became unbearable.

104.    Ms. Polk emailed Manager Boyd and Ms. Jenkins and told them that she was going to the emergency room and would provide them with the appropriate documentation. Neither responded nor inquired as to Ms. Polk's health.

105.    On or about January 1, 2019, Ms. Jenkins replaced Ms. Kinney as the Health Manager.

106.    On March 11, 2019, Ms. Polk told Ms. Jenkins about her inability to secure needed FMLA leave for her son.

107.    Ms. Jenkins suggested to Ms. Polk that she provide Ms. Jenkins with a copy of her son's therapy schedule and assured Ms. Polk that she would work with her.

108.    Despite Ms. Jenkins' reassurances Ms. Jenkins began to penalize Ms. Polk in her efforts in getting her son the needed medical attention.  Ms. Jenkins noted Plaintiff as leave without pay, accused her of not being at work, and required Plaintiff to utilize benefit time despite consistently averaging 40 hours, while other similarly situated employees continued to be treated more favorably as it pertained to leave policies and practices.

109.    On March 11, 2019, Plaintiff filed a complaint under her name with the U.S. Health and Human Services Office of General Inspector (hereinafter "OIG").  Her concerns for the health and safety of others had risen.  No action had been taken by either internal management or the County commissioners to address those concerns.  In this complaint Ms. Polk requested that corrective action be taken, identifying her concerns about health and safety of patients, including but not limited to inaccurate and untimely STD test results.  Ms. Polk reported that the Health Department lab had mixed up specimens, with some patients receiving a report of both a positive and negative results for the same test.   Some patients were receiving positive results for HIV tests even though they were negative.  A community partner was believed to be

triple billing patients, Medicaid and BCCCP and referring patients for additional services not warranted. Ms. Polk's complaint was acknowledged by OIG and a representative told her to keep her complaints quiet. To Ms. Polk's knowledge no action was taken by OIG.

110. On March 14, 2019, County Manager Diorio held a general body meeting. During the meeting Ms. Polk raised her health and safety concerns regarding inaccurate and untimely STD test results provided to County Health patients, and failure to provide language translation for Non-English-Speaking patients, and the retaliation against Ms. Polk for speaking out.

111. On or about March 19, 2019 Plaintiff exchanged a set of emails with Julie Berger, Administrative Assistant III (hereinafter "Ms. Berger") Plaintiff informed her of multiple verbal and written complaints to Manager Boyd and Mecklenburg County Employee Relations team, as well as her grievance sent to County Manager Diorio.

112. On March 19, 2019 Ms. Berger acknowledged that Ms. Polk's grievance was received by the Human Resources Department on October 13, 2018.

113. Ms. Berger informed Plaintiff it was not her responsibility to handle a grievance of this type.

114. Plaintiff again addressed concerns encouraging Ms. Berger to follow through with her complaints. Plaintiff reiterated that she initially filed complaints both verbally and written to Manager Boyd and the Mecklenburg County Employee Relations team. She added that she had then sent a grievance to County Manager Diorio, and that she had not received a response.

115. Ms. Berger responded that she could not follow through with the complaint anonymously. Therefore, Ms. Berger asked Plaintiff if it was okay that she use Plaintiff's name when filing. Plaintiff responded "Yes. . . I encourage it!"

116.     Upon information and belief, Plaintiff's prior complaints had been filed, yet Mecklenburg County Employee Relations team and County Managers had left her complaints unaddressed.  Thus no corrective action was taken, and Plaintiff was subjected to targeting and retaliation throughout her course of employment.

117.     Ms. Polk heard nothing more from County Manager Diorio or Ms. Berger. However, she was contacted by the County Administrators Tesha Boyd, Gibbey Harris, and Ms. Kinney.  Plaintiff received a letter on March 21, 2019 that had been backdated to December 27, 2018.  The backdated letter informed Plaintiff that they had denied her appeal.

118.     Ms. Polk assisted a co-worker who filed a Civil Action against the County in which he alleged retaliatory treatment for reporting issues overlapping with those raised by Ms. Polk.  This assistance, coupled with her recent complaints, added to the targeting and retaliation against Plaintiff.

119.     On March 19, 2019, Ms. Polk left work ill, returned to the office on March 21, 2019, became ill again, and was out through March 25th.

120.   On March 26, 2019, upon Ms. Polk's return to work she was presented with an email from Ms. Jenkins informing her that she was to complete work that went unattended while Plaintiff was out ill. Had Ms. Polk not been subjected to retaliation and discrimination she would not have been accused of not completing tasks in a timely fashion when she was out of work on medical leave.

121.   Ms. Polk advised Ms. Jenkins of her heavy workload and requested assistance. While similarly situated employees had been granted requests for assistance in similar circumstances, Plaintiff's request was denied in this and other instances.

122. On March 27, 2019, Plaintiff experienced an excruciatingly painful migraine and went to the Emergency Room for assessment and treatment. Ms. Polk immediately contacted Ms. Jenkins via text to inform her of her whereabouts. Ms. Jenkins responded to Plaintiff that she must return to work, and if Plaintiff failed to do so approval for medical leave would be denied. Plaintiff left the Emergency Room immediately to find out upon her return to work that her attendance was not required.

123. Plaintiff returned to the Emergency Room that evening with her two younger children. The Emergency Room providers were reluctant to release Plaintiff as she was suffering from severe neurological impairments. Plaintiff was released on March 28th, 2019 around 2:00 am under the condition that she follow up with a specialist in the morning.

124. On March 28th, 2019, Plaintiff followed up with her medical appointments. Plaintiff contacted Ms. Jenkins and informed her that she would be late to work due to mandatory medical appointments.

125. On March 28, 2019, against medical advice, Ms. Polk returned to work around 1:00 pm due to fear of consequences from the Health department.

126. On April 1, 2019 Ms. Polk wrote to Ms. Jenkins, as well as Health Department managers, alerting them of "failed STD Notification" She explained that patients had been alerted but no confirmation was shown that they had been informed of prior positive STD test results.

127. On April 2, 2019, Plaintiff was directed to the Human Resources office and informed that she was being placed on suspension.

128. On April 29th, 2019, Plaintiff was terminated.

129.  Mecklenburg County Human Resources Department's stated reasons for termination were ongoing performance and attendance concerns.

130.  Ms. Polk's attendance was satisfactory.  Criticisms of her attendance at and before the time of her termination were made because was a person with disability, and/or in retaliation against her for exercising her FMLA rights and complaining about safety issues.  To the extent Ms. Polk had any attendance violations her needs for time off were based on her disabilities,  and should and could have been accommodated without disruption to the County's programs.  Such accommodation was required of the County under the ADAAA.  Extended sick or medical leave is a frequent accommodation under the ADAAA.

131.  Ms. Polk denies having the performance problems that she was accused of having during the last year of her employment and at the time of her termination.  She interacted professionally with co-workers and managers, and she performed all assigned tasks according to proper County and medical procedures.  Ms. Polk was unreasonably criticized for not completing work that she could not complete due to her absence due to illness.  Her needs for time off were based on her disabilities, and should and could have been accommodated without disruption to the County's programs.

132.  Upon information and belief, the decision to suspend and then to terminate Plaintiff was made by Health Department Managers who were aware of Plaintiff's Health and Safety Complaints to the County and Commissioners, Plaintiff's disabilities, and her use of FMLA leave. The County terminated Plaintiff in retaliation, in order to contain the corruption and protect themselves and to retaliate against Plaintiff's complaints about public safety and health issues, use of FMLA leave and due to her disabilities.

133.   At and before the time of Ms. Polk's termination and employment, the County had a custom and *de facto* policy of retaliating against employees who raised within the Health Department and outside the Health department their concerns regarding Health Department failures that adversely affected public health, including but not limited to issues raised by Ms. Polk of inaccuracies of sexually transmitted disease testing, failures in informing patients of positive test results, flaws in the STD testing process resulting in testing inaccuracies, improper training, instructing nurses to provide negative results to patients, and the Health Department's issuance of letters which contained important test result information written in English only to non-English speaking patients.  County Manager Diorio, and Health Department Directors were made aware of Ms. Polk's complaints of public health and retaliation,  and failed to correct the retaliation against her.

134.    At least two other Health Department employees alleged in lawsuits filed in this County that the County retaliated against them by discipline and termination due to their complaints of unsafe and unlawful practices at the County Health Department which endangered the lives of some of the Health Department's patients.  These claims are brought in the cases of *Devallchio Adams v. Mecklenburg County*,  (W.D.N.C. 2019) and   Nicholson v. *Mecklenburg County*,  2019 U.S. Dist. LEXIS 23511  (W.D.N.C. 2/13/2019).

134.  Upon information and belief, the County still employs individuals similarly situated to Plaintiff, and individuals less qualified than Plaintiff.

135.    As a result of the County's conduct, Plaintiff suffered severe emotional distress including but not limited to anxiety, depression, lack of trust, embarrassment, humiliation, hopelessness, loss of interest or pleasure in activities, and social isolation.

## **COUNT I**

**(First Amendment Violation – Health and Safety Complaints, 42 U.S.C. § 1983)**

136.     The allegations of the previous paragraphs are realleged and incorporated herein by reference.

137.  Plaintiff has the right under the First Amendment to the U.S. Constitution to speak as a citizen on matters of public interest and concern related to the public health and safety crises affecting patients of the Health Department, as well as the community.

138. The public health and safety crises included matters of life and death for patients who were not being accurately informed or not informed at all of their test results for Pap smears, which test for cervical cancer; and certain sexually transmitted diseases.  The health and safety crises included incorrect test results, lost or mislabeled human specimens, lack of oversight, non-compliance, lack of training, poor management within the Health department, and other health and safety concerns set forth above.

139. When Plaintiff's concerns were not addressed internally by County Management and Human Resources, Plaintiff complained to a County Commissioner.

140.  Plaintiff was exercising her right to free speech when she complained to a County Commissioner.

141.     Plaintiff has the right under the First Amendment not to be punished or retaliated against by her public employer for speaking out as a citizen on matters of public interest and concern, or for engaging in protected activity.

142.     Plaintiff spoke on a matter of public concern when she shared her knowledge of the unacceptable health and safety crises affecting patients with a County Commissioner.

143.    Plaintiff's interest in expressing these concerns was primarily to protect and save the lives of the Health Department's patients, who are low-income groups without health insurance, and include minorities, refugees, women, and children.

144.    Plaintiff's speech is a matter of public concern because it exposed both potential and actual public health crises which are, or could potentially be, a matter of life and death to members of the community, as well as a matter of public disease control.  Plaintiff exposed the public health crises.

145.    Plaintiff spoke as a private citizen and not as an employee, because her official job duties as an Adult Health STD Nurse were to inform patients and their partners of sexually transmitted disease results and refer to the appropriate agencies and did not entail enforcement of health and safety standards, or gross mismanagement.

146.    The Health Department's interest in maintaining discipline and ensuring harmony as necessary to the operation of its mission of promoting public health was not impaired by Plaintiff's speech.

147.    The legitimate interests of the Health department do not include failing to notify patients who may have cervical cancer, HPV, or are at high risk of developing cervical cancer; covering up the failure to notify patients of their abnormal test results; endangering the lives, health, and safety of members of the community, and public at large, including women and children; or retaliation.

148.    Plaintiff's interest in expressing these public health crises involving potential and actual matters of health and safety and life and death, did not compete with the Health Department's interest in providing efficient and effective services to the public.  The Health Department is responsible for failing to provide efficient or effective services to the public.  To

the extent that Plaintiff's speech created any perceived risk to the Health Department's interests, any such apprehension was unreasonable and outweighed by Plaintiff's meritorious interest in saving lives.

149.    The Health Department terminated Plaintiff in whole or in part in retaliation for her speech about the problems of health and safety, cover ups, gross mismanagement, and the failure to meet the standard of medical care to which patients are entitled. At and before the time of Ms. Polk's termination and employment, the County and the Health Department had a custom and *de facto* policy of retaliating against employees who raised within the Health Department, and outside the Health department, their concerns regarding Health Department failures that adversely affected public health.

150.   The Health Department's stated reason for terminating Plaintiff, for allegedly poor performance and attendance violations **is** mere pretext for its actual reason: that Plaintiff brought unwanted scrutiny to the Health Department's mismanagement which created public health crises, endangered lives, and endangered the health and safety of the public and the Health Department's employees.  The Health Department's termination of Plaintiff was, upon information and belief, not an isolated incident, as two other former Health Department employees, Mr. Adams and Ms. Nicholson, allege they were fired or otherwise adversely treated in retaliation for making complaints about practices which endangered public health.

151.   The actions of the Health Department and the County, as described above, violated Plaintiff's rights.  The Health Department terminated Plaintiff, in whole or in part, to punish Plaintiff because she engaged in speech protected by the First Amendment. They did so without any legitimate justification; and upon information and belief the County deferred to the Health Department's decision.

152.     As a result of that violation of her First Amendment rights, Plaintiff has been injured.  Plaintiff has lost her job, her medical insurance, and other benefits.  She has been punished for her protected speech, and her exercise of that right has been improperly chilled.

153.     As a result of the County's actions, Plaintiff is entitled to have and recover all damages including reinstatement, compensatory, back pay, front pay, benefits, the costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988.

## COUNT II

**(Violations of the Americans with Disabilities Act, as amended, 42 U.S.C. 12101 *et seq.*.)**

154.     The allegations of the previous paragraphs are realleged and incorporated herein by reference. Ms. Polk is a person with a disability within the meaning of the federal Americans with Disabilities Act, as amended, and North Carolina's Equal Employment Practices Act.

155.     Ms. Polk has been diagnosed with PTSD, migraines, and other serious health conditions.  These conditions substantially limit her in one or more major life activities.

156.     Due to her medical conditions, Plaintiff required time off from work for medical appointments, treatment, and to recover from illness, and received protected Family Medical Leave Act leave for treatment for her medical conditions.

157.     Plaintiff's supervisors were well aware of her medical conditions, and Plaintiff was treated with disdain, harassed, suspended from employment and terminated, in whole or in part due to her disability, including her treatment for her medical conditions, and use of FMLA leave.

158.     The Health Department and County Management knew about Plaintiff's medical conditions and disabilities as early as March 2018, and continuing through the days leading up to her suspension and termination.

159. The Health Department's stated reason for terminating Plaintiff, is pretext for its retaliation. The County would not have terminated Plaintiff but for her disabilities, leave and/or her protected activity.

160. The County wrongfully retaliated against and terminated Plaintiff in whole or in part because she is a person with a disability.

161. The County's discrimination against Plaintiff also included assignment to two jobs, wrongful denial of leave, suspension, a poor evaluation and denial of training opportunities.

162. As a result, Plaintiff is entitled to recover from the County general, special, compensatory, consequential, and treble damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial; injunctive relief to enjoin continued violations of the ADAAA; reinstatement of full fringe benefits and seniority rights; compensations for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination; and reasonable costs, expenses, and attorneys' fees.

163. The Health Department through its employees and agents, either intended to cause or was recklessly indifferent to the likelihood that is conduct would cause severe emotional distress to Plaintiff.

164. The Health Department's conduct did in fact cause severe emotional distress to Plaintiff as set forth above. As a result, Plaintiff is entitled to recover from the County compensatory damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial for her emotional distress.

## COUNT III

**(Violations of North Carolina's Common Law Prohibition against Wrongful Termination In Violation for Public Policy, Based on the Policies Set Forth in the North Carolina's Equal Employment Practices Act N.C.G.S. 143-422.1 *et seq..*)**

165.     The allegations of the previous paragraphs are realleged and incorporated herein by reference. Ms. Polk is a person with a disability within the meaning of the North Carolina's Equal Employment Practices Act. The public policy of North Carolina, as set forth in the North Carolina Equal Employment Practices Act, N.C. Gen. Stat. § 143.422 *et. seq.)* prohibits workplace discrimination and wrongful termination employees because they have a disability.

166.     Due to her medical conditions, Plaintiff required time off from work for medical appointments, treatment, and to recover from illness, and received protected Family Medical Leave Act leave for treatment for her medical conditions.

167.     The Health Department and County Management including Plaintiff's supervisors were well aware of her medical conditions, and Plaintiff was treated with disdain, harassed, suspended from employment and terminated, in whole or in part due to her disability, including her treatment for her medical conditions, and use of FMLA leave.

168.     The Health Department's stated reason for terminating Plaintiff **is** pretext for its retaliation and discrimination against Plaintiff because she is a person with a disability and/or because of her protected activities.

169.     The County wrongfully retaliated against and terminated Plaintiff in whole or in part because she is a person with a disability.

170.     The County's discrimination against Ms. Polk also included assignment to two jobs, wrongful denial of leave, suspension, a poor evaluation and denial of training opportunities.

171.     As a result, Plaintiff is entitled to recover from the County general, special, compensatory, consequential, and treble damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial; reinstatement of full fringe benefits and seniority

rights; compensations for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination.

172.    The Health Department through its employees and agents, either intended to cause or was recklessly indifferent to the likelihood that is conduct would cause severe emotional distress to Plaintiff.

173.    The Health Department's conduct did in fact cause severe emotional distress to Plaintiff as set forth above.

174.    The Health Department's conduct did in fact cause severe emotional distress to Plaintiff as set forth above. As a result, Plaintiff is entitled to recover from the County compensatory damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial for her emotional distress.

## **COUNT IV**

**(Wrongful Discharge in Violation of North Carolina Public Policy – North Carolina Public Health Law N.C. Gen. Stat. §130A-1 *et. seq*., North Carolina Administrative Code – Health and Human Services, 10A NCAC 46.0201 and 10A NCAC 46.0216)**

175.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

176.    It is the public policy of North Carolina, as set forth in N.C. Gen. Stat. § 130A-1 *et. seq.* (hereinafter "NC Public Health Law"), that the "public health system is necessary to ensure that all citizens in the State have equal access to essential public health services.  The General Assembly declares that the mission of the public health system is to promote and contribute to the highest level of health possible for the people of North Carolina[.]". The NC Public Health Law requires county health departments to follow 10 essential public health services:

(1) Monitoring health status to identify community health problems.
(2) Diagnosing and investigating health hazards in the community.

(3) Informing, educating, and empowering people about health issues.
(4) Mobilizing community partnerships to identify and solve health problems.
(5) Developing policies and plans that support individual and community health efforts.
(6) Enforcing laws and regulations that protect health and ensure safety.
(7) Linking people to needed personal health care services and ensuring the provision of health care when otherwise unavailable.
(8) Ensuring a competent public health workforce and personal health care workforce.
(9) Evaluating effectiveness, accessibility, and quality of personal and population-based health services.
(10)     Conducting research.

N.C. Gen. Stat. § 130A-1.1(b).

177.  The Public Health Law also requires county health departments to follow state regulations governing health and safety standards, including Quality Assurance (10A NCAC 46.0203) (hereinafter "QA Regulations") and Laboratory (10A NCAC 46.0216) (hereinafter "Laboratory Regulations") services.

178.    It is a violation of public policy to terminate employees for objecting to violations of North Carolina public health statutes and regulations.

179.    Plaintiff in good faith reported to Linda Kinney, County Management, County Commissioner, and the OIG her concerns about continuing health and safety issues in the Health Department, which led to hundreds of patients not being informed of abnormal pap smear test results.  Plaintiff's concerns were addressed in prior litigation.

180.    Plaintiff also reported her fear of being targeted and subjected to retaliation by management.  Plaintiff's fear was realized after she was suspended and terminated shortly after reporting continued health and safety concerns to management and a County Commissioner after the County took no action in response to her complaints.

181.  The temporal proximity between Plaintiff's complaints and her termination strongly indicates the decision to end her employment was retaliatory.

182.  The Health Department's stated reason for terminating Plaintiff is pretext for its retaliation. The County would not have terminated Plaintiff but for her protected activity and/or her disabilities.

183.  The County wrongfully retaliated against and terminated Plaintiff for complaining about health and safety issues.

184.  The County's retaliation also included assignment to two jobs, wrongful denial of leave, suspension, a poor evaluation and denial of training opportunities.

185.  As a result, Plaintiff is entitled to recover from the County general, special, compensatory, consequential, and treble damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial; compensations for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination; and reasonable costs, expenses, and attorneys' fees pursuant to

186.  Plaintiff's health and safety complaints included putting patients at risk, lack of employee training; inaccurate and untimely test results provided to patients on health screens, and STD tests as well as the failure to provide patients accurate test results; lack of patient care; failure to meet quality assurance standards; and lack of oversight.

187.  The County and Health Department knew Plaintiff complained internally and externally to a County Commissioner at the time they decided to terminate Plaintiff. Plaintiff in good faith reported to her supervisors, to County Management, to a County Commissioner, and to the OIG her concerns about continuing workplace health and safety issues in the Health Department, which led to hundreds of patients not being informed of abnormal pap smear test results.

Plaintiff's concerns were addressed in prior litigation. Despite the third-party consultants' confirmation of workplace health and safety issues and gross mismanagement coupled with prior lawsuits health and safety issues continued.

188. Plaintiff also reported her fear of being targeted and subjected to retaliation by management. Plaintiff's fear was realized after she was suspended and terminated shortly after reporting continued workplace health and safety concerns to management and County Commissioners after the County took no action in response to her complaints.

189. The temporal proximity between Plaintiff's complaints and her termination strongly indicates the decision to end her employment was retaliatory.

190. The Health Department's stated reason for terminating Plaintiff's employment is pretext for its actual reason to terminate Plaintiff of retaliation for her complaints about health and safety violations.

191. The Health Department terminated Plaintiff in whole or on part due to her complaints about health and safety violations.

192. In so acting, the Health Department through its employees and agents, either intended to cause or were recklessly indifferent to the likelihood that its conduct would cause severe emotional distress to Plaintiff.

193. The Health Department's conduct did in fact cause severe emotional distress as set forth above.

194. The Health Department, through its employees and agents, violated North Carolina public policy prohibiting retaliation and terminating employees who object to violations of public health laws and regulations governing the County.

195.    The Health Department's conduct, as described above, was without justification or excuse, was reprehensible, and occurred despite Plaintiff's continued efforts to prevent, halt, and reverse the retaliatory treatment of her because of her multiple complaints to Health Department Management, Human Resources, County Management, County Commissioners, and her complaints to the OIG about the health and safety violations.

196.    As a direct and proximate result of the Health Department's unlawful conduct, Plaintiff is now and will continue to be unlawfully deprived of income in the form of wages, compensations, and other monetary and non-monetary benefits due to her, in amounts to be proven at trial.

197.    As a result, Plaintiff is entitled to recover from Defendant damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post- judgment interest; and the costs of this action.

## COUNT V

### (Wrongful Discharge in Violation of The Family and Medical Leave Act)

198.    The allegations of the previous paragraphs are realleged and incorporated herein by reference.

199.    Plaintiff Polk was a person with a serious health condition within the meaning of the FMLA at all relevant times during her employment with Defendant County.

200.    At various times, beginning in April, 2018, Plaintiff requested and received time off from work under the Family Medical Leave Act.  Although some of her applications for FMLA leave were granted, others were rejected, as discussed above.

201.   Due in whole or in part to her use of FMLA leave, and her applications for FMLA leave, Polk was treated with disdain, harassed, suspended from employment and terminated.

202.   Following Ms. Polk's use of FMLA leave, Ms. Polk was subjected to various acts of harassment and adverse actions, including an unwarranted suspension from employment.

203.   These adverse actions were taken in whole or in part due to Plaintiff's applications for and use of FMLA leave.

204.   As a result of Defendant County's wrongful acts and violations of her rights under the FMLA, Plaintiff has lost salary and benefits.  Plaintiff is entitled to receive compensatory damages in an amount in excess of Twenty Five Thousand Dollars ($25,000.00).

205.   Defendant's conduct was willful, wanton and in total disregard for the rights of Plaintiff which entitles the Plaintiff to recover liquidated damages in an amount in excess of  Twenty Five Thousand Dollars ($25,000.00).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays the Court as follows:

1.   Pursuant to Count I (First Amendment Violation – The Health and Safety Complaints), that Plaintiff have and recover all damages including reinstatement, compensatory, back pay, front pay, pre- and post-judgment interest, benefits, costs of this action and attorney's fees, pursuant to 42 U.S.C. § 1988;

2.   Pursuant to Count II Plaintiff is entitled to recover from the County general, special, compensatory, consequential, and treble damages in excess of twenty-five thousand dollars ($25,000.00)  in an amount to be proven at trial; injunctive relief to enjoin continued violations of the ADAAA; reinstatement to the same position held before the retaliatory termination or to an equivalent position; reinstatement of full fringe

benefits and seniority rights; compensation for lost wages, lost benefits, and other economic losses that were proximately caused by the retaliatory action or discrimination; and reasonable costs, expenses, pre- and post-judgment interest, and attorneys' fees pursuant to N.C. Gen. Stat. §§ 95-241 and 95-243;

3. Pursuant to Count III (Wrongful Discharge in Violation of Public Policy –N.C.G.S. 143-422 *et.seq.*) Plaintiff is entitled to recover from the County damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; and the costs of this action;

4. Pursuant to Count IV (Wrongful Discharge in Violation of North Carolina Public Policy – North Carolina Public Health Law N.C. Gen. Stat. § 130A-1 *et. seq.*, North Carolina Administrative Code – Health and Human Services, 10A NCAC 46.0201 and 10A NCAC 46.0216) Plaintiff is entitled to recover from the County damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive relief to deter similar misconduct in the future; back pay; front pay; damages for emotional distress; pre- and post-judgment interest; and the costs of this action;

5. Pursuant to Count V (Wrongful Discharge in Violation of The Family and Medical Leave Act) Plaintiff is entitled to recover from the County damages in excess of twenty-five thousand dollars ($25,000.00) in an amount to be proven at trial, including consequential, general, special, and compensatory damages; injunctive

relief to deter similar misconduct in the future; back pay; front pay; attorneys fees and the costs of this action;

6. That this matter be tried by a jury; and

7. That the Court grant such other and further relief as this Court may deem just, proper, and equitable.

This the 24th day of February, 2021.

FOSBINDER LAW OFFICE

*/s/Julie H. Fosbinder*
Julie H. Fosbinder, N.C. Bar 19400
840 Seneca Place
Charlotte, NC 28210
Jhanfos2@gmail.com
Telephone: (704) 333-1428
Telephone: (704) 560-8600
Facsimile: (704) 333-1431
*Attorney for Plaintiff*