**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO. 3:20-CV-00483-FDW-DCK**

| | |
|---|---|
| **VERONICA POLK,**<br><br>　　　　　**Plaintiff,**<br><br>　**v.**<br><br>**MECKLENBURG COUNTY,**<br><br>　　　　　**Defendant.** | **ORDER** |

THIS MATTER is before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 26), and Plaintiff's Motion to Supplement the Record, (Doc. No. 30). The Court held a hearing on the two motions on June 21, 2021, and for the reasons stated in open Court, Plaintiff's Motion to Supplement, (Doc. No. 30), is GRANTED. After carefully reviewing the briefing, the evidence submitted by the parties, and the arguments presented at the hearing, and for the reasons stated herein, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment. (Doc. No. 26).

## I. BACKGROUND[1]

This lawsuit arises out of Veronica Polk's ("Plaintiff") employment as an Adult STD Health Nurse with Mecklenburg County Health Department ("Health Department"). (Doc. No. 26-1, p. 3). Before starting her role as an Adult STD Nurse, Plaintiff worked as a Pediatric Nurse Case Manager for the Health Department in 2017. (Doc. No. 27, p. 1). Toward the end of her time in pediatrics, Plaintiff received a Written Coaching Memo in November 2017, notifying her that

---

[1] The background set forth herein is taken from a combination of the parties' briefing and attached exhibits. The background is taken in the light most favorable to Plaintiff as the nonmoving party.

various aspects of her job performance were unsatisfactory, including her repeated failures to timely follow up with patients. (Doc. No. 26-8). Shortly after Plaintiff received the Written Coaching Memo, she transferred to the Adult Health Work Unit and began her role as an Adult STD Nurse. (Doc. No. 27, p. 1). In her role as an Adult STD Nurse, Plaintiff was responsible for "informing patients and their partners of the results of sexually transmitted disease testing and referring patients out to the appropriate agencies." (Doc. No. 27, p. 1).

Beginning in March of 2018, Plaintiff began to have issues with her supervisor, Ms. Linda Kinney, particularly with respect to workflow protocol. Plaintiff emailed Ms. Kinney about "areas [in work protocol] that need further discussion and review." (Doc. No. 27-2, p. 5). Throughout March and April 2018, Plaintiff sent various emails to supervisors within the Health Department, describing her concerns with workflow and protocol. For example, on April 3, 2018, Plaintiff sent an email to Ms. Kinney and other supervisors detailing "examples of how the established protocol steps do not correlate with actual clinic flow." (Doc. No. 27-2, p. 9). One such example was Plaintiff's concern with timely notification protocol. As Plaintiff explained in her email, the required three follow-up phone calls were an unrealistic work requirement because "it is sometimes impossible to contact patients 3 times within a 24 hour timeframe . . . in addition to [Plaintiff's] other expected duties." Id. Plaintiff also emailed the United States Department of Health and Human Services, alleging various generalized instances of fraud and negligence committed by the Mecklenburg County Health Department. (Doc. No. 30-5, p. 10). Other emails in the record reflect similar concerns.[2] See (Doc. Nos. 27-2, pp. 5-13; 27-3, pp. 1-7).

---

[2] Plaintiff also alleges she spoke to "County Manager Dena Diorio" about what Plaintiff characterizes as her "Health and Safety Concerns," but there is no evidence of this in the record beyond Plaintiff's own affidavit. See (Doc. No. 27-1, p. 7).

Throughout her employment as an Adult STD Nurse, Plaintiff took various instances of leave under the FMLA to care for her family and for herself. In her declaration, Plaintiff states she has been diagnosed with PTSD, migraines, and hand tremors. (Doc. No. 27-1, pp, 3-4). Although the record is unclear with respect to the exact dates and timeline for Plaintiff's various requests for FMLA leave, it is clear that she was denied leave once in October 2018 for failure to provide requisite medical certification, (Doc. No. 30-4, pp. 8-14), and that she was approved intermittent leave to occur between January 2019 and July 2019. (Doc. No. 30-4, p. 33).

During the time frame for which such intermittent leave was requested and approved, Plaintiff "left early [on March 27, 2019] without permission" and texted her supervisor: "I left and texted to advise I have a health issue that I need to attend to. I know you're short staffed, so I will do my best to return. Please don't cause a scene about it." (Doc. No. 26-6, pp. 3, 22). Plaintiff also "left early on March 21, 2019, before a scheduled day off on March 22, 2019, and called out the following business day, March 25, 2019." Id. at p. 3. Plaintiff's absences in late March were cited as a reason for her termination. Id. Plaintiff's employment was formally terminated on April 25, 2019. Id. at p. 2.

As a result of her termination, Plaintiff instituted this lawsuit, filed initially in state court, in June 2020. (Doc. No. 1-1). She asserted four causes of action against Defendant, alleging her termination was: (1) unlawful retaliation under the First Amendment; (2) disability discrimination in violation of the Americans With Disabilities Act ("ADA"); (3) wrongful in violation of North Carolina public policy as stated in North Carolina's Equal Employment Practices Act ("NCEEPA"); and (4) wrongful in violation of North Carolina public policy as stated in North Carolina's Public Health Law. (Doc. No. 1-1). Upon removal to this Court, and after Defendant's initial Motion to Dismiss ripened for review, (Doc. No. 6), Plaintiff amended her Complaint and

added one new count: interference with her rights under and retaliation in violation of the Family Medical Leave Act ("FMLA"). (Doc. No. 13). Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint on March 9, 2021, (Doc. No. 14), which the Court granted in part and denied in part. (Doc. No. 21). The Court left in place all but Plaintiff's claim for wrongful discharge in violation of public policy as stated in North Carolina's Public Health Law. Id. Shortly thereafter, Defendant filed the instant Motion for Summary Judgment, which served as the basis of the hearing conducted on June 21, 2021. After reviewing the briefing by the parties, the exhibits submitted by the parties, and considering the arguments set forth at the hearing, the Court addresses Defendant's Motion for Summary Judgment herein.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings

4

to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. ANALYSIS

#### A. First Amendment

Defendant first argues Plaintiff cannot assert a retaliation claim under the First Amendment via 42 U.S.C.§ 1983 as a matter of law. (Doc. No. 26).

The First Amendment to the Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Cont. amend. I. The right to freedom of speech includes the right to be free from retaliation for engaging in protected speech. Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Notably, public employees are protected "from termination of their employment in retaliation for their exercise of speech on matters of public concern." McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998). "'[P]ersonal grievances [such as] complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment.'" Id. (quoting Stroman v. Colleton Cnty. Sch. Dist., 981 F.2d 153, 156 (4th Cir. 1992)).

Whether an employee is speaking on a matter of public concern is the "threshold question." Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012) (citation and quotation omitted). In determining whether a public employee's speech is protected under the First Amendment, courts are instructed to "consider the 'content, form, and context of a given statement.'" Id. (quoting Connick v. Myers, 461 U.S. 138, 147-48 (1983)). Specifically, courts should "scrutinize the comments to assess whether they are intended 'to evaluate the performance of the office'—which would merit constitutional protection—or merely 'to gather ammunition for another round of controversy' with superiors—which would not." Brooks, 685 F.3d at 371 (quoting Connick, 461 U.S. at 148). Ultimately, courts should be "wary of affording the broad cover of the First Amendment to comments limited to 'grievances about conditions of employment that cannot be considered matters of public concern.'" Brooks, 685 F.3d at 372 (quoting Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007)).

Defendant moves for summary judgment of Plaintiff's First Amendment claim for three reasons: first, Plaintiff has not and cannot establish municipal liability under 42 U.S.C. § 1983; second, Plaintiff has not engaged in protected speech; and third, Plaintiff has not established causation. (Doc. No. 26-1, pp. 6-10). The Court will address each of Defendant's arguments in turn.

## 1. Municipal Liability

Defendant first argues Plaintiff has failed to establish a county policy or custom of retaliation in violation of the county's employees' First Amendment Rights. In response, Plaintiff simply argues:

> [S]he has provided sufficient evidence that Defendant had a custom or policy of violating its employee's [F]irst Amendment rights. First, there were at least two other recent federal cases arising from the Health Department's adverse treatment of employees which were pending in this District. In both cases, the employees

> complained that they had raises [sic] concerns about public health violations and had suffered termination or other adverse actions in retaliation for those concerns.

(Doc. No. 27, p. 13).

To prevail on a § 1983 claim against a municipality, a plaintiff must show that the constitutional violation was caused by an official custom or policy of the municipality. Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978). Municipal policy is most easily found in local ordinances and regulations, but policy may also be found in "informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." Spell v. McDaniel, 824 F.2d 1380, 1385 (4th Cir 1987) (emphasis in original). "To hold a municipality liable for a single decision (or violation), the decisionmaker must possess 'final authority to establish municipal policy with respect to the action ordered.'" Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)). The question of who possesses final policymaking authority is one of state law. Pembaur, 475 U.S. at 483.

Here, Plaintiff has not provided *any* evidence whatsoever that Defendant had a municipal policy or custom of retaliating against employees in violation of its employees' First Amendment rights.

First, Plaintiff does not identify or provide evidence that the person who made the decision to terminate her employment was a final policymaker.[3] To the contrary, evidence submitted by Defendant, and not disputed by Plaintiff, indicates that, upon termination, Plaintiff was notified of her right to appeal her termination and she opted not to pursue the appeals process. (Doc. No. 26-6, p. 60); see also (Doc. No. 26-1, p. 5). Plaintiff's termination cannot be said to be the decision of

---

[3] Defendant indicates that the County Manager is the final decisionmaker for termination decisions made by the Health Department. See (Doc. No. 26-1, p. 7). Plaintiff does not dispute this. See generally (Doc. No. 27).

an individual with *final* policymaking authority if such decision can be reversed or overturned by someone else. See Love-Lane, 355 F.3d 766 at 782-83 ("[The plaintiff] must demonstrate that the [municipality] was aware of the constitutional violation and either participated in, or otherwise condoned it."). Without any evidence, or even argument, that the individual who decided to terminate Plaintiff was a final policymaker, the Court is left to assume Plaintiff attempts to establish *respondent superior* liability, which is impermissible as a matter of law under § 1983. See Monell, 436 U.S. at 691.

Second, all Plaintiff points to as evidence of a county policy or custom is the existence of two previous federal lawsuits "arising from the Health Department's adverse treatment of employees." (Doc. No. 27, p. 13). However, "citation to lawsuits is not equivalent to offering [evidence] of" municipal policy or custom, particularly when the lawsuits result in no liability for the defendant.[4] See Ulloa v. Prince George's Cnty., Md., No. 15-0257, 2015 WL 7878956, at *4-5 (D. Md. Dec. 4, 2015). By attempting to rely only on two lawsuits in which the plaintiffs did not prevail on the merits as evidence of a municipal policy or custom, Plaintiff fails to show the existence of a genuine dispute of material fact with respect to municipal liability.

## 2. Protected Conduct

Even assuming Plaintiff could somehow show a genuine dispute exists with respect to municipal liability, the evidence before the Court fails to establish a genuine dispute as to whether Plaintiff was speaking on a matter of public concern. The content, form, and context of Plaintiff's speech reveals that her speech concerned personal grievances and complaints about the conditions

---

[4] Notably, *Defendant* provided the Court with citations to the cases Plaintiff points to as evidence of municipal custom or policy. The cases are Adams v. Mecklenburg Cnty., No. 3:19-cv-00602-GCM, and Nicholson v. Mecklenburg Cnty., No. 3:18-cv-00167-FDW-DCK.

of her employment, which is not the type of speech that is entitled to protection under the First Amendment.

First, as to content, Plaintiff's characterization of her speech differs markedly from the substantive content of her speech as evidenced by emails she provided. For example, Plaintiff states in her affidavit that she requested "corrective action be taken in regard to inaccuracies with STD testing and inconsistencies with protocol and procedure for STI pool notification. (Doc. No. 27-1, p. 2). She also states that she "reached out directly to Linda Kinney to raise concerns regarding improper training" and regarding the issuance of letters written in English to non-English speaking patients. Id. at pp. 2-3. However, Plaintiff's emails—provided by Plaintiff herself—paint a different picture.

In the emails Plaintiff cites to as evidence of her speaking out about the issue of translation issues for patients, Plaintiff explains to her supervisor that she needs a letter translated into Nepali and asks her supervisor to "unlock [Plaintiff's] ability to modify the letters . . . so that [Plaintiff] can set up and print [her] letters in the system." (Doc. No. 27-3, p. 5). In response, a supervisor, Wendy Lacy ("Ms. Lacy"), directed Plaintiff to send a "clean" copy of the letter to have translated, and Ms. Lacy offered her help if Plaintiff needed further assistance. Id. at pp. 3-4.  The remaining emails discussing translation needs demonstrate that Plaintiff's supervisors *were* responsive to her various translation needs and accommodated Plaintiff's requests for translation. See id. at pp. 1-7 ("Hi Veronica, I have attached the STD letter in English & Spanish.").

In another email sent by Plaintiff to her supervisors, Plaintiff explains she has "identified areas [of the proposed SO-17] that need further discussion and review," and suggests a round table discussion on "changes and clarification of what is written."[5] (Doc. No. 27-2, p. 5). Plaintiff

---

[5] Neither Plaintiff nor Defendant explain or provide evidence explaining what SO-17 is.

emailed that "it would be selfish of anyone to compose this without understanding how this may affect another's role or departments functionality." Id. The email does not contain any mention of the types of "Health and Safety Concerns" Plaintiff describes in her affidavit.

In yet another email cited as evidence of Plaintiff's speech on matters of public concern, Plaintiff explained to her supervisor that various aspects of "established protocol" did not "correlate with the actual clinic flow." (Doc. No. 27-1, p. 9). As an example, Plaintiff complains that the requirement of three phone calls to a patient within twenty-four hours is "sometimes impossible" because if she had "10 patients that needed to be contacted by phone possibly x3 that will equal 30 calls within a 24 hour period in addition to [Plaintiff's] other expected duties." Id. In the same email, Plaintiff asks to "discuss how we can make adjustments to fit the better interest of the true flow of this work," because Plaintiff felt "as if . . . duties were dumped on [her] with no support from [her] designated trainer." Id. at p. 10. No reasonable jury could consider this speech anything other than complaints about the conditions of Plaintiff's employment.

Ultimately, the content of Plaintiff's emails to supervisors demonstrates a dissatisfaction with workflow and other conditions of employment, as well as various needs for clarification of protocol. The content of Plaintiff's speech does not seek to inform the public "about the Mecklenburg County Health Department[']s refusal to follow regulatory requirements." (Doc. No. 27, p. 13). Nor do any of Plaintiff's emails "seek to bring to light actual or potential wrongdoing or breach of public trust." See Brooks, 685 F.3d at 373 (citation omitted). Plaintiff's emails, "if released to the public, would convey no information at all other than the fact that a single employee is upset with the status quo."[6] Id. (citation and quotation omitted).

---

[6] Plaintiff's Exhibit 5 reflects an email chain between multiple Health Department employees, including Plaintiff, regarding "Standardized Workflow for Communication of STD Test Results," but the emails sent by Plaintiff have no substantive content. See (Doc. No. 27-12). Moreover, Plaintiff does not cite to this Exhibit anywhere in her

Second, as to form and context, Plaintiff's complaints were all expressed via email to her supervisors or other Health Department staff, and the emails were sent within the context of personal dissatisfaction or protocol/workflow inquiry. To be sure, Plaintiff states that she contacted County Managers about her Health and Safety Concerns via email, but as with the emails described above, the content and context reflect statements made by an employee who was unhappy with her supervisor. See (Doc. No. 27-7, pp. 26-28). Plaintiff also states that she "initiated a formal complaint with the U.S. Health and Human Services Office of Inspector General, ("OIG")" and cites to an email sent on March 11, 2019, but she provides no evidence that the email was received or acknowledged by the OIG.[7] See (Doc. No. 30-5, p. 10).

Plaintiff also avers that she addressed "County Manager Dina Diorio at a general body meeting" about the Health & Safety concerns, but there is no evidence of this in the record. Plaintiff cites to Exhibit L-2, but Exhibit L-2 reflects an email chain between Plaintiff and Julie Berger, in which Plaintiff states "I then sent an official grievance to Dena Diorio;" however, Plaintiff does not make any actual substantive statements about her alleged Health & Safety concerns. (Doc. No. 30-5, pp. 11-20). There is simply no evidence in the record of the actual grievance sent to Ms. Diorio. The only complaints documented in the record were complaints sent via email, which discussed Plaintiff's workflow and supervisor concerns. Emails sent to county managers and internally to supervisors may be fairly said to be "public" in form, but the context of Plaintiff's emails clearly demonstrate that Plaintiff did "not seek to communicate to the public or to advance a political or social point of view beyond the employment context." See Brooks, 685 F.3d at 373.

---

Opposition Motion. See (Doc. No. 27). Regardless, to the extent Plaintiff seeks to rely on the evidence presented in Exhibit 5, there is no documented speech made by Plaintiff.

[7] Even if the email were received and acknowledged by the OIG, the email does not cite to any facts that would serve as the basis of Plaintiff's complaints and there is no evidence in the record that Defendants were aware of the email. See (Doc. No. 30-5, p. 10).

Ultimately, Plaintiff's own uncontroverted evidence demonstrates that her complaints are more accurately characterized as personal grievances rather than matters of public concern. The only evidence that Plaintiff provided to support her characterization of her complaints is her own affidavit. Plaintiff's personal characterization of her speech is insufficient to counter the substantial evidence—*provided by Plaintiff herself*—showing that she spoke about private concerns regarding the conditions of her employment. There is accordingly no genuine dispute as to whether Plaintiff engaged in protected conduct—the evidence demonstrates that she did not, and Defendant is entitled to summary judgment on Plaintiff's First Amendment claim.[8]

## B.      Americans with Disabilities Act[9]

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges or employment." 42 U.S.C. § 12112(a). The ADA also prohibits employers from retaliating against employees who engage in protected ADA activity. § 12203(a).

Here, Plaintiff asserts Defendant generally discriminated against her in violation of the Americans with Disabilities Act, but Plaintiff does not make clear whether she is asserting a retaliation claim, a discrimination claim, or both. See (Doc. No. 13, pp. 24-25). The Court will accordingly evaluate the merits of an ADA retaliation claim and the merits of an ADA discrimination claim in turn.

---

[8] In the interest of judicial efficiency, the Court declines to analyze Defendant's causation argument.

[9] Based on the record before it, the Court notes that Plaintiff has not filed an EEOC charge prior to filing suit, which is a mandatory requirement. See Sydnor v. Fairfax Cnty., Va., 681 F.3d 591, 593 (4th Cir. 2012). However, because the requirement is procedural rather than jurisdictional, the issue is waivable if not raised at the appropriate stage of litigation. See Fort Bend Cnty., Tx. v. Davis, 139 S. Ct. 1843, 1851-52 (2019) (holding that Title VII's "charge-filing requirement" is "mandatory without being jurisdictional"). Defendants here have not raised the EEOC issue, and the Court accordingly declines to address it.

### 1. Discrimination

To survive summary judgment for an ADA discrimination claim, a plaintiff is required to "provide evidence sufficient to demonstrate that (1) [s]he 'was a qualified individual with a disability'; (2) [s]he was 'discharged'; (3) [s]he 'was fulfilling h[er] employer's legitimate expectations at the time of discharge'; and (4) 'the circumstances of h[er] discharge raise a reasonable inference of unlawful discrimination.'" Reynolds v. Am. Nat. Red Cross, 701 F.3d 143, 150 (4th Cir. 2012) (quoting Rohan v. Networks Presentations, LLC, 375 F.3d 266, 277 n.9 (4th Cir. 2004)). Once the *prima facie* case is established, Defendant has an opportunity to produce evidence of a legitimate, non-discriminatory reason for terminating Plaintiff. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The burden then shifts to Plaintiff to provide evidence that Defendant's non-discriminatory justification was merely pretext. See id. at 804.

Defendant does not contest that Plaintiff is a qualified individual with a disability and only argues there is no evidence to support that Plaintiff was meeting her employer's legitimate expectations at the time of discharge.[10]

In her Opposition Motion, Plaintiff asserts she was meeting her employer's legitimate expectations. As evidence for this, Plaintiff points to *one* email from her supervisor, Ms. Linda Kinney, in which Ms. Kinney told Plaintiff "We are a dream team!" (Doc. No. 27-2, p. 3). Plaintiff also states in her Opposition Motion, that on another occasion, Ms. Kinney told Plaintiff that "the team was lucky to have [Plaintiff]," but there is no evidence of this in the record beyond Plaintiff's own Declaration. See (Doc. No. 27, p. 9). As to the "we are a dream team" email, the email provides no context for Ms. Kinney's statement. See (Doc. No. 27-2, p. 3). The only context the

---

[10] Defendant does not contest that Plaintiff is a qualified individual with a disability. (Doc. No. 26-1, p. 14). However, the Court is nonetheless concerned with the dearth of objective medical evidence in the record to support Plaintiff's claim that she is disabled for purposes of the ADA. Indeed, there is *no* medical evidence in the record.

Court can glean is from the subject line, which reads: "Re: STD Test Result Communication Discrepancies." Id. However, a subject line and statement of "we are a dream team" from a supervisor without *any further context* is insufficient to raise a genuine dispute as to whether Plaintiff was meeting her *employer's* legitimate expectations. Plaintiff also argues that any criticisms of her work were "wholly unwarranted," without providing any factual, as opposed to opinion, evidence in support. (Doc. No. 27, p. 9). Plaintiff can point to no other evidence in the record to raise a genuine dispute as to whether Defendant was satisfied with her work performance.

Indeed, Defendant has provided substantial record evidence indicating the Health Department was dissatisfied with Plaintiff's work performance long before her termination. Defendant has submitted a copy of Plaintiff's Termination Package, which is 61 pages long and details numerous instances of Written Performance Reminders, complaints of absenteeism, inability to timely notify patients of test results, and inappropriate interactions with fellow employees. See (Doc. No. 26-6). Moreover, Plaintiff *and* Defendant provided as evidence Plaintiff's Annual Performance Review from September 2018, which indicates that Plaintiff was given an "NI" grade for each of her core competencies.[11] See (Doc. Nos. 26-7, 27-6). The only difference between Plaintiff's Exhibit and Defendant's Exhibit is that Plaintiff provides her own written response to the performance review. Compare (Doc. No. 26-7) with (Doc. No. 27-6).

Also notable is Plaintiff's Written Coaching Memo, dated November 21, 2017—months before any alleged discrimination took place. (Doc. No. 26-8). The Memo, signed by Plaintiff, explains that Plaintiff was verbally coached on her performance issues seven times before she was issued the Written Coaching Memo. Id. The Memo sets forth in detail a number of Plaintiff's performance issues, including that Plaintiff was behind on her work. Id. Plaintiff's failure to timely

---

[11] The Court presumes "NI" refers to "Needs Improvement" because the comments on the Review repeatedly indicate that "[Plaintiff] needs improvement." See (Doc. No. 26-7).

complete her work was a stated reason for her termination in April 2019. See (Doc. No. 26-6, p. 4).

Ultimately, Plaintiff can only point to *two* statements made by Ms. Kinney, which mention Plaintiff's contributions to the "team," in support of her argument, but such statements contain no context that could lead a reasonable jury to conclude Plaintiff was meeting her employer's legitimate expectations.[12] Plaintiff's characterizations of the other, undisputed record evidence are simply insufficient to withstand summary judgment on the record before the Court. See Evans v. Techs. Application Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996) (noting that in a discrimination case, "it is the perception of the decision maker [of the employer] which is relevant, not the self-assessment of the plaintiff"); Bryant v. Bell Atl. Md. Inc., 288 F.3d 124, 134-35 (4th Cir. 2002) ("These affidavits, however, amount to no more than subjective beliefs, and such evidence, without more is insufficient to create a genuine issue of material fact."). Defendant is accordingly entitled to summary judgment on Plaintiff's ADA discrimination claim.

### 2. Retaliation

The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter." 42 U.S.C. § 12203(a).

A plaintiff asserting retaliation in violation of the ADA must "either offer sufficient direct and indirect evidence of retaliation[] or proceed under a burden-shifting method." Rhoads v.

---

[12] Whether or not Plaintiff was meeting Ms. Kinney's legitimate expectations is a meaningfully different inquiry than the inquiry of whether Plaintiff was meeting her *employer's* legitimate expectations. Undisputed evidence in the record indicates that, in mid-2018, neither Plaintiff nor Ms. Kinney were meeting their employer's legitimate expectations. See (Doc. No. 26-9) A Human Resources Department Investigation revealed that *Ms. Kinney* "failed to provide adequate training oversight" and "did not conduct formal supervisory meetings with [Plaintiff]." Id. at p. 5. If Ms. Kinney herself was not meeting her employer's legitimate expectations, Plaintiff cannot rely on only Ms. Kinney's passing statements as evidence that Plaintiff was meeting her employer's legitimate expectations.

F.D.I.C., 257 F.3d 373, 391 (4th Cir. 2001) (citation omitted). If proceeding under the first method, a plaintiff will only survive summary judgment if he or she "produce[s] direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact." Id. (citation and quotation omitted). If proceeding under a burden-shifting method, a plaintiff must first prove a *prima facie* case of retaliation and show that "(1) [s]he engaged in protected conduct, (2) she suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." Reynolds, 701 F.3d at 154 (citation omitted). If a *prima facie* case is established, the burden shifts to the employer to show that it had "legitimate nonretaliatory reason[s] for its actions." Rhoads, 257 F.3d at 392. Finally, the plaintiff must establish that any legitimate reason offered by the employer is simply pretext. Id.

Here, Plaintiff has offered no direct or indirect evidence of stated purpose to discriminate and must accordingly proceed under a burden shifting framework. Under a burden shifting framework, Defendant argues that Plaintiff has not engaged in any protected activity, which is an essential element of Plaintiff's retaliation claim. (Doc. No. 26-1, p. 13). Plaintiff does not dispute this. See (Doc. No. 27). Indeed, after careful review of the record, the Court finds Plaintiff has not even alleged she engaged in the conduct protected under the ADA. To be sure, Plaintiff alleges "retaliation" generally, but does not specify any instances of ADA-protected conduct other than taking FMLA leave, which is more appropriately handled under the FMLA. Thus, to the extent Plaintiff asserts an ADA retaliation claim, Defendant is entitled to summary judgment.

C.      **Wrongful Discharge in Violation of North Carolina Public Policy (N.C. Gen. Stat. § 143-422.1)**

North Carolina's Equal Employment Practices Act ("NCEEPA") provides that "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion,

color, national origin, age, sex or handicap." N.C. GEN. STAT. § 143-422.2(a). When asserting a wrongful discharge claim in violation of public policy as set forth by the NCEEPA, a plaintiff bears the same evidentiary burden as required for an ADA claim. See N.C. Dep't of Corr. v. Gibson, 301 S.E.2d 78, 84 (N.C. 1983) (adopting the "evidentiary standards and principles of law" of Title VII for discrimination claims asserted pursuant to the NCEEPA); see also Perdue v. Sanofi-Aventis, U.S., LLC, No. 19-2094, 2021 WL 2324553, at *6 n.5 (4th Cir. June 8, 2021); Brown v. Martin Marietta Materials, Inc., 440 F. Supp. 3d 503, 519-20 (M.D.N.C. 2020) (holding that a wrongful discharge claim in violation of the NCEEPA rises and falls with an ADA claim). Here, Plaintiff has not met her evidentiary burden with respect to her ADA claim; her wrongful discharge claim in violation of public policy as set forth in the NCEEPA must also fail.

**D.     Family and Medical Leave Act**

The Family and Medical Leave Act makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of . . . any right under [the FMLA]" or to "discharge or . . . discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a). At oral argument, Plaintiff made clear that she is asserting both an FMLA interference claim and an FMLA retaliation claim. The Court accordingly evaluates the merits of Plaintiff's FMLA claims under both the interference and retaliation theories.

**1.     Statute of Limitations**

At the outset however, the Court must consider whether any portion of Plaintiff's FMLA claim is time-barred. The FMLA contains a statute of limitations, requiring any lawsuit to be filed within two-year of an alleged violation of the Act. § 2617(c)(1). The limitations period is extended to three years for willful violations. § 2617(c)(2). Willful violations occur when the "employer 'knew or showed reckless disregard [as to] whether its conduct was prohibited [by the FMLA].'"

IJames v. Autumn Corp., No. 1:08CV777, 2009 WL 2171252, at *13 (M.D.N.C. July 20, 2009)

(quoting Settle v. S.W. Rodgers Co., 182 F.3d 909 (4th Cir. 1999) (unpublished table decision)).

Willful violations of the FMLA generally do not occur when an employee's request for FMLA

leave has been granted. See Honeycutt v. Baltimore Cnty., Md., No. JFM-06-0958, 2007 WL

1858691, at *3 (D.Md. June 18, 2007) (citing cases where there was no willfulness when the

employee's FMLA request was granted), aff'd 278 F. App'x 292 (4th Cir. 2008).

In its Motion, Defendant argues Plaintiff seeks to hold Defendant liable for violations that

are barred by the two-year statute of limitations. (Doc. No. 26-1, p. 17). Plaintiff filed her initial

Complaint in state court on June 4, 2020, (Doc. No. 1-1, p. 2), and in her Amended Complaint,

she alleges Defendant's conduct in violating the FMLA was willful. (Doc. No. 12, p. 32). Thus,

any alleged FMLA violation that occurred prior to June 4, 2018, is barred unless Plaintiff provides

evidence of a willful violation through "'depositions, affidavits, answers to interrogatories, or

admissions on file.'" Bosse v. Baltimore Cnty., 692 F. Supp. 2d 574, 583 (D. Md. 2010) (quoting

Washington v. Purdue Farms, Inc., No. 4:07-3552-TLW-TER, 2009 WL 386926, at *8 (D.S.C.

Feb. 13, 2009)). Plaintiff has not provided any evidence to support a willful violation of the FMLA

and, when asked about evidence of willfulness at oral argument, Plaintiff's attorney stated that

Defendant violated the FMLA willfully when it terminated Plaintiff's employment immediately

upon her return from FMLA leave. (Tr. at 14:31-14:32). Argument by Plaintiff's counsel is not

sufficient evidence of willfulness, particularly when Plaintiff was granted her FMLA leave request.

Thus, the two-year statute of limitations applies, and any alleged violations that occurred prior to

June 4, 2018, are time barred.

## 2. Interference

The FMLA prohibits employers from interfering with employees' ability to exercise their substantive rights under the FMLA, including the right to take "12 workweeks of leave during any 12-month period" for various medical and/or family reasons. 29 U.S.C. § 2612 (a)(1); § 2615 (a). To make out an FMLA interference claim, an employee "must demonstrate that (1) [s]he is entitled to an FMLA benefit; (2) h[er] employer interfered with the provision of that benefit; and (3) that the interference caused harm." Adams v. Anne Arundel Cnty. Pub. Schs., 789 F.3d 422, 427 (4th Cir. 2015) (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (internal citations omitted)).

An employee is only entitled to an FMLA benefit if the employee is taking "FMLA-qualifying leave" and provides adequate notice to the employer of the qualifying leave. See Rhoads, 257 F.3d at 382-83 (discussing the employee's FMLA obligations); Rodriguez v. Smithfield Packing Co., 545 F. Supp. 2d 508, 515-16 (D.Md. 2008) ("The core requirements for triggering an employer's obligations [under the FMLA] are a *serious health condition* and *adequate communication*, meaning a timely communication sufficient to put an employer on notice that the protections of the Act may apply." (emphasis in original)); Brushwood v. Wachovia Bank, N.A., 520 F. App'x 154, 157 (4th Cir. 2013) (quotations omitted).

Although Plaintiff here insists she is asserting an interference claim, the only possible allegations of interference the Court can glean are the allegations that Plaintiff's "request for FMLA leave for her son was denied in spite of several attempts to obtain it from late October 2018, thought March 2019." (Doc. No. 27, p. 15). Notably absent from this one-sentence allegation of interference is any citation to the record, any proffer of evidence indicating Plaintiff was entitled

to such leave for her son, and any proffer of evidence or argument that Plaintiff was prejudiced by the denial of the requested leave.

Regardless, even after a careful combing-through of the record, the Court is unable to find *any* evidence of FMLA interference between October 2018 and March 2019. The only documented evidence of Defendant denying Plaintiff's requests for leave are automated emails summarizing Plaintiff's leave request, notifying Plaintiff that the leave request was denied, and listing "no medical certification" as the reason for denial. See (Doc. No. 30-4, pp. 8-15). All other automated emails either indicate that Plaintiff's leave request was granted or that Plaintiff's leave request was successfully submitted. See (Doc. No. 30-4). Additionally, Plaintiff's own evidence indicates she was given extra time to submit the Department of Labor form necessary to approve her FMLA request and that she was warned her FMLA request would be denied without the form. (Doc. No. 30-2, p. 6). Ultimately, the undisputed record evidence shows that Plaintiff was either not entitled to FMLA leave for failure to submit proper certifications or that she was granted FMLA leave. While approval of FMLA leave "does not automatically foreclose [an] interference claim," there is simply no evidence in the record that Defendant interfered with Plaintiff's FMLA rights. See Vannoy v. Fed. Rsrv. Bank of Richmond, 827 F.3d 296, 303 n.5 (4th Cir. 2016). To the contrary, the record evidence indicates that Defendant, in at least one instance, took extra steps to ensure that Plaintiff received any FMLA leave to which she was entitled. Defendant is accordingly entitled to summary judgment on Plaintiff's FMLA interference claims.

### 3. Retaliation

"Retaliation claims brought under the FMLA are analogous to those brought under Title VII." Adams, 789 F.3d at 429 (citing Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013). Unless a plaintiff can offer direct and/or indirect evidence of discrimination, a plaintiff must

prove the following to establish a *prima facie* case of retaliation under the FMLA: "(1) she engaged in protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events." Adams, 789 F.3d at 429 (internal quotations omitted). Then, if the defendant can provide a nondiscriminatory reason for the adverse employment action, the plaintiff has an opportunity to show that the employer's stated reason is pretext. Id.

Here, the Court is satisfied that Plaintiff has pointed to evidence that sufficiently raises a genuine dispute as to material fact. Plaintiff has presented evidence that she was granted intermittent FMLA leave for the period beginning January 18, 2019 and ending July 17, 2019. (Doc. No. 30-4, p. 33). Defendant's evidence indicates Plaintiff was terminated shortly after returning from what Plaintiff claims was FMLA leave in late March of 2019. See (Doc. No. 26-6). Defendant has argued it had a non-discriminatory reason for Plaintiff's termination, and Plaintiff has argued Defendant's stated reason is pretext. Thus, the question is one of credibility, which is more appropriate for a jury. Accordingly, Defendant is not entitled to summary judgment on the limited question of whether Plaintiff's termination shortly after returning from alleged FMLA leave in March 2019 was impermissible retaliation under the FMLA.[13]

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiff's Motion to Supplement the Record, (Doc. No. 30), is GRANTED. Defendant's Motion for Summary Judgment, (Doc. No. 26), is GRANTED IN PART and DENIED IN PART. The Court GRANTS summary judgment in favor of Defendant

---

[13] The Court emphasizes that its conclusion about whether Plaintiff was meeting her employer's legitimate expectations at the time of discharge with respect to an ADA discrimination has no bearing on Plaintiff's FMLA retaliation claim. With the ADA discrimination claim, the Court concluded that Plaintiff could not satisfy her burden in establishing an essential element of the *prima facie* case. See supra Section B.1. With FMLA retaliation however, Plaintiff has satisfied her evidentiary burden with respect to the *prima facie* case, and the triable issue is whether Defendant's stated non-discriminatory reason for termination was pretext or not, which is a question only of credibility.

as to Counts I, II, III, and IV of Plaintiff's Amended Complaint. See (Doc. No. 13). The Court DENIES summary judgment as to Count V, to the extent it asserts a claim of FMLA retaliation for leave taken in March 2019. Given that this matter will proceed to trial on the limited issue of FMLA retaliation, the parties shall submit their pre-trial submissions no later than July 7, 2021. Docket call is at 9:00 AM on July 12, 2021, in Courtroom #5B of the Charles R. Jonas Federal Building, located at 401 West Trade Street, Charlotte, North Carolina, 28202.

TAKE NOTICE that a pretrial conference will be held immediately following docket call on July 12, 2021.


IT IS SO ORDERED.

Signed: June 25, 2021


Frank D. Whitney
United States District Judge